James Thompson appearing on behalf of William Michael Dennis. I'm ready to begin the argument as the court directed. AEDPA applies to this case under Montiel but Mr. Dennis prevails under AEDPA. Whether you look at the California Supreme Court's denial as a failure to demonstrate a Strickland violation or whether you look at it as a failure to state a prima facie case, Mr. Dennis prevails under either avenue. Before I begin the actual argument, I wanted to bring up something that I think is significant because it plays into both prejudice and performance. And that is that this case, compared to so many other capital cases, is really quite unique. And it's unique in five ways. One is that Mr. Dennis had no felony convictions. Mr. Dennis had no misdemeanor convictions. Mr. Dennis had no unadjudicated conduct that could have come in. In fact, Mr. Dennis had never been arrested before this crime. If we were in the federal system, his criminal history points would have been zero. It would have been category one, but he nevertheless would have been a zero. Second is that the motive for the crime was driven by the tragic drowning of his three-year-old son, Paul. There was not a robbery as a motive. There's no theft. There's no sexual offense. There's not greed. There's not any serial killings. There's not any kind of criminal motive other than the death of his child and his belief that his wife was responsible, former wife was responsible for it. In his, at that time, very deluded mind, his wife had to be responsible. She didn't dive into the water to save the child. She went to a neighbor's house instead. She wasn't found negligent by the civil jury in the wrongful death action, which translated in Mr. Dennis's mind is that she must have been intentional in her actions instead of negligent. The co-worker's comments at some point in time to him about maybe she wanted Paul dead. Those were the triggers that motivated and led to this tragedy. Now, there was an underlying series of mental maladies that Mr. Dennis was undergoing, but it was that point in time where the delusional disorder as later diagnosed by Dr. Woods and then concurred by Dr. Benson, who was the trial psychiatrist. Twenty years later. Excuse me? Twenty years later. Yes. Twenty years later. Twenty years later was when the habeas counsel was able to present evidence that people claimed that your client could have put forward, for example, a not guilty by reason of insanity defense 20 years before. Well, I think the habeas petition wasn't filed that long ago. The first petition has some of these claims in it. And the reason it's late is because trial counsel was ineffective. Had trial counsel provided the documents and all the other materials to Dr. Benson, had he listened to Dr. Gordon, had he listened to Dr. Caldwell, had he listened to Dr. Stevenson or Dr. Erdberg or any of the other factors that were involved in the case and those opinions, and had he provided records. Well, counsel, Mr. Gonzales provided a huge number of records, but I have a question for you on this. I apologize if I get the ER numbers wrong. I think it's ER 97, but it's part of the 12-19-17 order. As noted here, none of the reports or correspondence submitted to trial counsel by his experts, including Drs. French, Stevenson, Garten, Benson, made a finding that Petitioner was insane at the time of the crimes, despite trial counsel's correspondence suggesting a potential insanity defense. So can you point me to anything that would indicate that what the district court said there was incorrect in any regard? Yes, because the records and the information that was provided to Dr. Benson and to others was not the information that was needed for him to come up with a diagnosis of delusional disorder. Yeah, but isn't that because it didn't exist? No, it did exist. Well, I'm looking here, for example, at Mr. Gonzales' memo to file, which lists the files given to Drs. Garten, Stevenson, and Benson, and it looks to me like it's an enormous number of documents, including the CALJIC instructions for murder, insanity, and diminished actuality. And his correspondence to them was saying, you know, I need your help seeing if we can come up with a defense based on his mental state. So it looks to me like Mr. Gonzales did a huge amount in this case, and I don't see what the district court got wrong here in suggesting that he wasn't under an obligation to just keep going from doctor to doctor until he was able to find one who said that your client was insane. But he didn't need to go to doctor to doctor. All he needed to do was go to the doctors that he talked to, because each one of those doctors, Dr. Garten, Dr. Caldwell, Dr. Stevenson, Dr. French, Dr. Erbert, I'm not sure about Dr. Erbert, all of those doctors testified at the evidentiary hearing, both by direct testimony and even by cross-examination, that the information that post-conviction counsel had given them was exactly the information that they needed in order to render opinions. Well, that's not what the district court said, and that's not what I see in the evidence. The district court said, yeah, that's what they said 20 years later, but the district court looked at what counsel did give them and didn't see what it was that should have moved the needle with them from being asked to diagnose a mental state not being able to do it and looked to me like Mr. Gonzalez gave them an enormous amount of material. Whether he gave him an enormous amount of material or not is not the point. The point is that when they were given the full range of material that we gave them in post-conviction, they all came back with, and Dr. Benson specifically said, my diagnosis would not have been depressive disorder solely. It would have been delusional disorder based upon the information that we gave him, which was a complete social history, was a complete set of records. As opposed to the social history that the PD's office developed. Twelve pages. A 12-page social history. And how many witness interviews? I don't know the exact number. I think we ended up putting in evidence. No, I mean that Mr. Gonzalez furnished them. Scores of witness interviews. No, it was not scores. I don't know the exact count, but it was not. Let me ask you specifically with respect to Dr. Woods. He lists 49 sources of information that he looked at. Which of those existed at the time and Dr. Benson did not have access to? I don't want to give you a precise count. I don't recall there being anything that was provided to the experts that wasn't available had they done the investigation. In other words, there wasn't some sort of thing that we came up with that was new and different than what was already available. The problem is we're kind of talking up here as opposed to specifics. And following on Judge Bennett's questioning, it does seem that there is an ultimate minor variation in conclusion here. But the question is where did the trial attorney go wrong, consulted one, two, three, four, at least five different sources, and they just didn't quite reach the hope or the decision that you might have hoped for. So you have to kind of, it seems to me, distinguish between a now, 20 years later view and what the attorney did back then. They're two separate things. So what is it that Dr. Benson and others didn't have access to that they should have? I don't have the excerpts of record or I don't have the specific declarations. You don't need to give me the excerpts of record because I'm happy to go back and even find those. But tell me substantively what was missing. Well, in part was the social history and all of the development by all of those witnesses of what Michael Dennis was going through as a youngster and what it is that he went through in young adulthood and then got to the point where he was working as he was working. But all of that social history doesn't seem to me that it's going to change anything if we were to have to get into prejudice, for example. I mean, that's where I'm having some trouble understanding how that would have changed the diagnosis or would have changed what happened in terms of what the attorney did. I'm glad to answer the prejudice question. Does that mean Dr. Benson saw him, what, five times? Yes, and Dr. Benson testified when he was given the information that we gave him, whatever time period was later, but was available at the time that he testified, and he testified to this at the evidentiary hearing, that that changed his diagnosis from depression to a delusional disorder. But I think what we're having trouble with, and I think Judge McKeon and I are both having trouble with this, is we looked at what Dr. Benson testified to. We looked at what the district court found. We looked at the materials that he was given. We understand what he said, but the district court said in some ways his testimony was different than what the contemporaneous information showed, that he never said he needed anything more. That he wasn't simply asked to opine on whether your client was being truthful. So I think what Judge McKeon is asking is, and I would want to know too, give us some examples of what was so different in kind or nature or quality that it really would have moved the needle here, because it looks like that there was evidence that the doctor had, that your client had a speech impediment and a hearing problem, that he was a loner. There was a lot of evidence about how distressed he was at his son's death and how he blamed his ex-wife. And it just looks like this other evidence is just more of the same, but not needle-moving stuff. And I'm having trouble seeing what it is that, other than Dr. Benson's conclusions of what he would have done 20 years before, what the actual evidence is that's new that they didn't have that would have actually moved the needle. The only thing I can say at this point, I mean, I'm glad to look at the excerpts and provide a citation to those, but it's in the testimony of Dr. Benson. But I don't, like Judge McKeon, I don't need a citation. I need a description. I mean, maybe there could have been some more evidence about his hearing impairment. Maybe there could have been some more evidence about social isolation. Maybe there could have been some more evidence about how distressed he was, although there was a lot. But I just don't see how that gets you where you need to go here, even if we were looking at this case de novo. Even if you were to say that the evidence that we provided to the experts and the experts testified about was of the same kind, and I think it's different, but if you were to say it of the same kind, it is significant enough that each one of the doctors that trial counsel retained had a difference of opinion and informed their opinion, like Dr. Stevenson and Dr. Garten and Dr. Erdberg and others, who did the MMPI testing and did the Rorschach testing, all had indications of paranoia and other items that would have fit a delusional disorder diagnosis. So when they got the full set of information, which was social history, mental health background information, they were able to change their opinion. I want to stop you right there, because it's really the third time you said that it was all available, describing this full set that you've identified. And my problem is trying to figure out what you mean by it was all available. It may be the underlying facts were there, but you've already referenced the social history, which you denigrated as being only 12 pages long, wasn't the same as the social history developed and presented to the experts as part of the post-conviction relief effort later. Well, we have to strip out hindsight, and so I'm trying to figure out what exactly, when you say it was available, you mean by that. Do you mean the underlying facts were there for somebody else to develop it? Yes. Well, isn't that a problem? Yes, it is, because trial counsel didn't do his job. Isn't that a problem for us? No, it's not. We've got to strip out the hindsight, and what should have told trial counsel that the efforts that he undertook, which at least in terms of number of contacts and providing materials and so forth, appear extensive. What should have told trial counsel it wasn't extensive enough because you hadn't come up with whatever was going to be identified many years later as potentially the key? That's the fact that somebody hasn't come up with a key doesn't mean that the performance of that counsel is deficient. So what made the fact that it could have been developed by somebody else enough to identify what counsel did at the time as deficient? Trial counsel interviewed the persons that were interviewed by post-conviction counsel. He would have got the same information that post-conviction counsel. That information was readily available at the time trial counsel had the case. The best example, perhaps, of this is Strickland expert Thomas Nolan, who is a well-respected judge, a well-respected counsel in that area, testified at the federal hearing that Mr. Dennis' trial counsel failed to provide representation that satisfied the prevailing standard of care in 1988, going back to the 1988-1989 guidelines and the other criteria that were in place at that time. Because he didn't do the social history investigation, he didn't interview the witnesses for triggers of mental health and background information. There wasn't like that you could go to a hospital and get records of Mr. Dennis' medical situation. He had never been hospitalized. So it wasn't that. It had to be the core witnesses. It had to be those facts. Those facts were available by trial counsel's time. And instead of trial counsel pursuing a mental state defense that he set out in an early letter to the experts, instead of pursuing that, he had Dr. Benson interview Mr. Dennis for the purposes of determining whether or not he was telling the truth about the crime. Well, that's what Dr. Benson testified to, but that's not what the contemporaneous evidence showed. Well, I disagree. Well, I understand that. But, I mean, I'm looking at the letters that Mr. Gonzalez wrote to Dr. Benson, several letters telling him what he was hoping he could do on the mental defense, and just Dr. Benson testifying at trial that the materials he had been given were adequate. And I understand Dr. Benson is saying this 20 years later, but when I look at the contemporaneous materials, I don't see it. Well, but Dr. Benson testified to it. What he testified to is not much. He said, I wasn't aware of the depth of the delusions and paranoia due to the limited materials. I mean, he certainly testified to delusional tendencies. He testified to paranoia. But he doesn't really tell us, in his view, what was missing. It's a pretty cursory, conclusory affidavit that he now provides 20 years later. So had he said, this is what I was missing, or this was why I couldn't do that, it might have more traction. But I'm a little, you know, this is not unlike other affidavits we've seen 20 years later, because it doesn't tell you what was missing. But that was taken as the direct examination as a method that the court imposed for the hearing. That was taken as direct. Look at the cross-examination and look at the redirect examination, and that does explain what we're up against here. But I want to go to prejudice for a second here. This is a person who has no record whatsoever. This is a person who had complete lack of aggravation save the crimes in this case. Horrible, horrible crimes. But almost all capital murders are horrible, horrific crimes. The jury came back with a second-degree verdict on the unborn child. The jury was out four and a half hours on the penalty phase. That just goes and proves what I'm saying is trial counsel didn't do his job. No, well, I mean, I suppose theoretically that could be proof of what you're saying, but what the district court found was that the four-hour penalty phase deliberation, I believe the district court's words were it could be reasonably inferred that the jury didn't think it was close because of the horrible, aggravating nature of the crimes, and the district court didn't think that the extra evidence would have moved the needle. But the court could also have said that it was also proof of the fact that trial counsel didn't put on the case that was put on the post-conviction hearing. No, but the district court found that even if trial counsel had put on that case, the district court didn't think it would have moved the needle. Isn't that what the district court said? I know that if we don't find out for deference applies, we're applying de novo review, but isn't that what the district court did say? I would not take every one of those words and say I agree with that. I'm not saying that he didn't say that. I'm just saying I can't, without looking at that, I can't say yes or no. But it still goes to the fact that there is complete lack of aggravation, that even the aggravated crime was mitigated, and all the jury did not hear it. Sorry, how was the aggravated crime mitigated? Because of the second degree as the unborn child. And if any of this evidence, and the last thing is that the jury didn't hear it because defense counsel failed to ask about it, was he was a model inmate. Wasn't he in protective custody? Might have been in protective custody some time, but still you can get, I've got plenty of clients that are in protective custody who get write-ups by CDCR. He did not have a write-up in that jail. I may have missed a jump. What is it about the second degree conviction that you want us to draw from? I say that because of this. Had any of this, had all of the mitigating mental health evidence that we introduced at the evidentiary hearing, had that been presented to a jury, all that evidence could have gone to is had that jury make a determination that the death of the child was voluntary manslaughter and not second degree. Didn't the California courts say there is no such thing because a child, a fetus not born alive, that there is no manslaughter lesser because it's not a human being? Well, you know, the child, they could have presented a mental state defense that he did not have the intent as to the child, which would have reduced it. Didn't the California courts say there was no such thing as a lesser of voluntary manslaughter for the fetus? But they wouldn't have had to have decided second degree. And if they hadn't decided second degree, then there would not have been a special circumstance. And if there wasn't a special circumstance, Mr. Dennis couldn't have been sentenced to death. He couldn't even have been sentenced to life without possibility of parole. So I have a question. One of the things that I think the district court found was if all this mental health evidence had theoretically been developed and offered as an NGI defense, that that would have opened the door or could have opened the door to the government rebuttal. So I have two questions on that. First of all, Mr. Gonzalez was available to you, including by a deposition, and you chose not to take a deposition, right? I think he was available to former counsel, yes. Okay. And so you never put on any evidence as to why Mr. Gonzalez did or didn't choose to go forward with an NGI defense, right? We did not have him testify, nor did the state. Yeah. And so another question. You're familiar with your client's ex-girlfriend, Twyla? Yes. And Twyla told the PD investigators that your client had told her that he knew Doreen was pregnant? Yeah, I remember that report. But he didn't tell that to the police when they interviewed her. She didn't tell that to the police when they interviewed her. Couldn't one reason counsel have decided not to put on any of this stuff was because he was afraid that they would then re-interview Twyla, and if she testified to the jury that her client told her shortly before the killings that he knew Doreen was pregnant and was real angry about it, that that could have basically taken away any chance that Mr. Gonzalez had about prevailing on anything? I don't think so. I mean, I don't think that. . . It wouldn't have been devastating if Twyla took the stand or somebody quoted Twyla saying, shortly before the killings, which I knew once I heard about him, I knew he had done it, but shortly before the killings he told me that Doreen was pregnant again and he was really mad about it. That wouldn't have been devastating evidence? It would have been more evidence in the picture of things, but it would have been still done in the time period of developing an insanity defense so that whatever was going on with the delusional disorder that caused this to happen in the first place, the killing of Doreen would not have been played out because there would have been an order of insanity, and opening the door to a speculative report that may or may not have been done that no one endorsed as saying that that's the reason. And defense counsel, petitioner's counsel, were not under a duty to have counsel testify. The case law is clear on that. That's not in our position. My comment was there just wasn't any evidence there on that. On what? Just factually, the judge gave you the right to depose him. There was an order from, I think, Judge Fogle saying you could depose Mr. Gonzalez, and you made the decision not to. That was just a factual question. I think it's former counsel made that decision. Yes, okay. So we're at that stage. Well, you know, one of the issues, of course, is the magnitude of what you've characterized as mitigating evidence that wasn't presented. And if I understand your position, you're basically saying everything, even if minute, should have been presented in the penalty phase. But some of what you're talking about, it seems to me, such as a divorced parent or issues with weight, are things that the jury understands, and they're not things that would have changed the calculus here. So is it your position that the defense counsel made no strategic judgment on what to present and what not to present? Well, he can't have made a strategic judgment or decision about what he did not investigate. Because the duty to make a decision or the process of making a decision only follows what has been determined to be the end result of a valid investigation. He did not investigate, so he can't make a decision not to do something. Had he investigated and done all the interviews that we had done and put all together the witness reports or declarations that we submitted, some 51, had he done all of that and then he had decided, I don't want to call the brother, but I want to call the mother, or I don't want to call two witnesses, but I want to call another, yes, then you're stuck with that. That's a reasonable tactical decision. But you can't make it in a vacuum, and that's what he did here, because he did not do the investigation. As Mr. Nolan made very clear, he did not meet the standards of 1988 as what a reasonable counsel would have done under these circumstances. The performance in this case is truly, and I speak as a trial attorney as well who handles these cases, the performance by trial counsel in this case was abysmal. Counsel, whatever the result of this case is, I would respectfully say that the performance of trial counsel was not, in my view, abysmal. Whether you ultimately prevail or not, and whether reasonable people could differ as to whether he should have done more and whether he failed the Strickland test, I would respectfully say that the objective evidence here is that whatever it was or wasn't, it was not abysmal. I'm trying to persuade, not argue, but I have a different opinion, and I've seen a lot of these cases. As we have. I understand. And I've seen them in the courtroom, I mean, in trials. So I have a better sense, I think, at some level of knowing what jurors respond to. And I am telling you that the kind of case that would have been presented here to a jury of 12 people who you only had to convince one person of with respect to whether or not these mitigating factors, which were large had they been developed properly, outweighed or even tied the aggravating factors, and the only aggravating factors in this case were the facts and circumstances of the crime, as horrific as they were, but a first degree and a second degree. I do want to ask you, we've pretty well focused you on this mitigation evidence, but I do want to ask you about the execution impact evidence and whether, at the time, I'm not sure the law in California was even clear that that kind of mercy testimony was admissible. And so I'd appreciate your comments on what the state of the law was, and if it's not clear that it's admissible, how would that be ineffective assistance of counsel? Without going into a brief and actually looking at the cases, we did brief it. I think even the district court makes mention of the fact that it was admissible, because the district court, as I recall, found error in the performance prong of not introducing that. So I think the law is clear. Do you think the law was clear in 1988? Yes. Okay. I didn't read it that way, but I'll go back and look. Well, and the district court, I think, like I say, found error in that regard. But even if you leave that aside, there was no objection to the prosecutor when the prosecutor stood up and said not a single person came into this courtroom to say that Mr. Dennis' life should be spared. Yeah, I think going to Judge McEwen's point, what one of the filings on that point was, and we couldn't have put it in because the prosecutor would have objected that it was irrelevant. I think that was one of the habeas filings about how horrible the prosecutor's comment was, because if we had tried, the prosecutor just would have objected that it's irrelevant. I don't, without knowing what particular filing you're talking about, whether it's the attorney general's or mine. No, it was, I don't know if it was yours. It was not the attorney general's. Okay. It was your client's lawyers who filed a pleading, I think, at an early stage that said on that issue, on the prosecutorial misconduct issue, it was particularly bad because if we had tried, they would have objected that it was irrelevant. I don't, I'm not going to follow that line. All I know is trial counsel should have objected,  and we got declarations from all of the witnesses, which goes back to your point. Readily available? Yes. We went and talked to the witnesses. Would you have testified that your son, your child, your brother, your friend was worthy of saving? And they all said, yes. Had I been asked that, I would have. Now, that's a readily available fact that trial counsel did not pursue. So trial counsel should have asked the question. So you've gone over your time. This is a capital. Oh, sorry. No, no. This is a capital case. We will give you a fair amount of time for rebuttal. Thank you. And we'll hear from the Attorney General. Good afternoon. Alice Luster on behalf of the respondent. May it please the Court, as counsel has indicated today, he recognizes that under Montiel, under Harrington, under Cullen v. Pinholster, the review is under 2254D is of the decision that was made by the Supreme Court, California Supreme Court, on the merits. And those cases require that this Court and any reviewing court look to the possible reasons  not whether or not counsel sustained a burden of a prima facie case. The issues before this Court all deal with variations on the claims that trial counsel was ineffective for the case. For this case, it is clear we know that the standard and the test for that is set forth in Strickland, which counsel must be deficient and that deficiency must have prejudiced. But for this case in particular, I think review of the facts of Strickland is helpful. Strickland committed three brutal murders. He initially confessed to only one of them. Counsel was appointed, began his work, began discovery. Strickland then confessed against counsel's advice to the two remaining murders, at which point counsel experienced feelings of hopelessness as to the case because he now had a client who had confessed to three brutal murders rather than just one. Strickland then, against advice of counsel, pled guilty and waived a jury, leaving counsel's only job to present a penalty phase to judge alone. Counsel spoke with Strickland about his life and got information about his background. He spoke on the phone with Strickland's mother and his wife, but when a first meeting with those two women did not come to fruition, he failed to follow up and set another meeting. Counsel did not seek out any other character witnesses to present on Strickland's behalf, nor did he request a psychiatric exam or look further into Strickland's emotional state. At Strickland's initial appearance, he had told the judge that he had little in the way of prior criminal history and that he was under significant emotional stress at the time because of his inability to provide for his family. But counsel did not look into that. And yet the United States Supreme Court, reviewing this, said that he did not violate the Sixth Amendment's right to counsel. There was no deficient performance and there was no prejudice. And here what we have is counsel who did a great number of things. He consulted several mental health experts. He researched the law on insanity, on post-traumatic stress disorder, and on grief and the way those might impact the mental state of Dennis. He consulted with several experts, including one specifically specializing in grief. And that expert told him that based on a lack of post-traumatic stress disorder, that he could not prove helpful or provide any helpful testimony to Dennis during his trial, although he urged counsel to present evidence regarding his grief. Could I just maybe move ahead a little bit? Certainly, Your Honor. Because we know that he did a fair amount in terms of these approximately five experts. But the more pointed question I think that counsel raises that we had Dr. Benson, who now says if he had gotten these additional materials, he would have more clearly been able to come to a firm conclusion on the delusion as a psychiatric disorder. So that's a fairly precise thing. We know that Dr. Benson looked at things, but he says, no, I would have actually been able to provide a much stronger conclusion, and, of course, one that arguably could have given a defense. So would you focus on this situation with Dr. Benson before and after? Yes, Your Honor. And first I would say that the information that was provided in the later state habeas proceedings and then in the federal court was essentially more of the same, more in-depth in some areas. We have statements from 20 additional witnesses saying what a great guy he was, how devastated he was by Paul's death, and various things. It was essentially more of the same. And while Dr. Benson, yes, did testify that he felt he could have made a stronger diagnosis and was more in agreement with Dr. Woods by that time, there's really nothing in that evidence that is a game changer, as it were, or really turns the tide in something new and different. Additionally, as the district court noted, Dr. Benson's memory in terms of his testimony was at least flawed in that he insisted he had never seen the pre-sentencing report, despite documentation that it had been sent to him. And it was a report that he called extraordinarily complete. He talked about one of the most complete summaries of the social history of the defendant. And in terms of being asked to not ask to deal with insanity, when we know from the documentation that he was specifically asked to, he was sent instructions, he was sent the law, he was told that diminished capacity was no longer available in California, and yet he did not provide anything that was helpful in that. And I think in terms of looking at an insanity defense, you also have to look at, Dr. Woods testified that he thought that Dennis would meet this standard because he believed that Doreen had murdered his son. But under McNaughton, the test is whether or not they're laboring under such disease or defect as to not know the nature and quality of their act, or if he did know the nature and quality, did not know what he was doing was wrong. Now, on cross-examination, Dr. Woods agreed with the question that he was asked. So Dennis set out to kill. He did kill. And he killed his intended victim. And Dr. Woods agreed that that was correct. But under McNaughton, morally wrong qualifies under wrong, right? Yes, in terms of he did not know that what he was doing was wrong. That is, if he were under a delusion that it was not morally wrong to kill the woman who had murdered his son, that that works under McNaughton were the jury to believe that, right? It can if the jury believes it. And isn't that basically what in the habeas proceedings Dr. Benson testified to? That this would have been stronger evidence as to his delusional belief that what he did in killing her was not morally wrong? It's possible. Well, but Dr. Woods also specifically was asked the question, did he understand that it was wrong to commit that act, being the murder? And he said, yes, he agreed that Dennis did understand that it was wrong. So the jury would have heard that. Is it inconsistent if he understood it was wrong, but delusions led him to believe that he had no choice but to kill her because she had killed the son? I think that would have been a stretch to get the jury to follow that, Your Honor, when given all of the actions that Dennis took to try to evade arrest to begin with. Well, that's what Dr. Cohn said, right? Dr. Cohn said in, what was it, Dr. Cohn said there were 23 versions, and the first nine of which he denied having done the killings at all. And isn't Dr. Cohn saying, well, that shows that he knew the killings were morally wrong, because that's why he denied it. If he had thought that they weren't morally wrong, why would he be denying it? That's correct, Your Honor. And I think certainly had trial counsel attempted to present this at the trial, that's exactly what would have come out on cross-examination, is how do you explain then that he picks Halloween because he feels he can get away with it. He dons two masks, takes three weapons, and then disposes of them. Well, he said that to a number of the doctors, right? Didn't he specifically say to the doctors, I picked Halloween because that would help me get away with it? That's correct, Your Honor. He did. He said that a number of times, and so therefore the experts knew this, which may account for why Dr. Benson and others were unwilling to make the finding of insanity that the trial counsel had asked them to consider, and would certainly have been something that trial counsel could have had in mind in assessing what to try to put on. Well, the respondent also chose not to depose Mr. Gonzales, right? That's correct, Your Honor. So you could have if you had wanted to, and then we would have known what Mr. Gonzales had in mind. That's correct, Your Honor. We did. However, the burden is always on the petitioner in these cases. But yes, you are right. We did not. But we normally would see, if appropriate, we'd see an affidavit or declaration proffered by defense counsel, but that's also a strategic decision that they've made as well. That's correct, Your Honor. And that you've made. Yes. That's correct. Nobody chose to bring Gonzales. As I recall, correct me if I'm wrong, in early on stages of the habeas proceeding, Mr. Gonzales did submit a declaration, right? He did, Your Honor. But not on the points we're talking about today. That's correct, and significantly his declaration did not touch on these specific points, which indicate that counsel, at the time, the habeas counsel was attempting to talk to him, and either he wouldn't or couldn't provide information. We would just be speculating. With regard to the discussion of what Mr. Nolan said as to the Strickland counsel, as to counsel's failure to act as effective counsel, Mr. Nolan admitted that he had not read Dr. Benson's trial testimony, when he was opining that counsel didn't do enough and didn't put in enough information in front of the jury. He had not even read the testimony that Dr. Benson presented to the jury, so he didn't know. He admitted that the various guidelines did not have the force of law in terms of what counsel was required to do. And he agreed, and this is on pages 67 and 68 of the excerpts of record, where the district court is discussing the various experts and their testimony. He goes through a list of the types of things that counsel should look into, and then he admitted or agreed that trial counsel's file, in fact, contained much of that information. But he looked into possible defenses. He had researched insanity. He had researched post-traumatic stress disorder. He had researched grief. He had talked to a number of experts. He had test results that were, at best, conflicting with the mental health in terms of the few things that the experts did say, such as some paranoia, some possibilities of delusions. But then the test results that were available were not consistent with those findings. And, in fact, once we got to federal court and looked further and the petitioner developed more evidence, Dr. Watson's testing, in fact, was inconsistent with the findings, although he said that his test results supported Dr. Wood's and they worked together. But Dr. Watson found that Dennis had his intellect was in the high-average range, that one test that was average is the one most sensitive to the impact of psychiatric. Well, on the IQ, I mean, wasn't that something that Dr. Gardner had looked at decades before? Yes, Your Honor. And isn't that in? I know there's no report from Dr. Gardner, but in the document entitled, if I'm remembering correctly, draft report. Draft report. Doesn't he point that out, the IQ findings? Yes. And that's part of what counsel would have had before him when trying to make his decisions about what to present, is he had information from Dr. Garten that the intellect and judgment were normal, maybe high-average. He had a better-than-average planning ability, that his reality testing was basically intact. And Dr. Garten specifically said his excellent sense of social responsibility and the ability to anticipate consequences of his initial acts and situations. And that's the kind of statement and opinion that had Dr. Garten been in front of the jury attempting to present an insanity defense would certainly have at least, at a minimum, detracted from that. And there's some letter in the file saying, am I right, that he discussed with Dr. Garten whether he would be cumulative to Dr. Benson and that they both agreed he shouldn't testify? Yes, Your Honor. I mean, that doesn't go to the question that your friend is raising about that if Dr. Garten had had more information, he might have testified differently. But Dr. Garten, at least contemporaneously, apparently agreed that he shouldn't testify. That's correct, Your Honor. And there were several things. And the other thing to keep in mind is that Dr. Benson provided testimony relying on the information that was obtained from Dr. Garten, Dr. Stevenson, Dr. Caldwell, Dr. French, but without because it was coming in a summary form through Dr. Benson that had less opportunity for the prosecutor then to cross-examine those experts as to, well, didn't you say that his reality testing was basically intact? Didn't you say that he has an excellent sense of social responsibility? Dr. French talked about him being a well-controlled, normal man who denies wrongdoing. And I believe it was Dr. French who also indicated that because he denied wrongdoing and said he wasn't responsible for this, his paranoia levels were not unreasonable and not to be unexpected. Although, am I right, Dr. French's report is like from 85, so several years beforehand? That's correct, Your Honor. So he was at a time when he was denying, but things changed once he started admitting. That's correct. However, this was all part of the information that counsel would have had before him when he was making his decisions as to who to put on. Right. Correct, Your Honor. I look at this case, I guess I'm fortunate. I've never had to deal with capital cases in the way that the two of you have. I've now dealt with, it seems to me, a surprising number of cases from this side. And the facts here don't fit the patterns of most of the cases I've dealt with before, which I can imagine adds to the challenge of trial counsel. But it's really where Mr. Thompson started. This is not somebody who has a record of being in trouble. It's not somebody who's subnormal in any intellectual fashion, not a drug deal or some other criminal action gone bad. I mean, it's just, and so you look at this and you try to figure out, well, how do you put the pieces of this together? And the part that's made me wonder from the first time I read about the facts of this case is just, it's hard to escape the sense that this guy is or was for that particular episode nuts, not in control of himself. Now, that's not from any studied or legal definition, and I understand the law doesn't put that out there. But it's what has given me trouble trying to figure out, even as I sympathize with trial counsel trying to figure out how to deal with the facts of this case. Do you have a sense of why it is a stronger light wasn't pointed in that direction? Well, Your Honor, I think, I mean, we would disagree that counsel did not make a strong presentation. Through not only Dr. Benson, but then through the 16 lay witnesses, they did present the torture and the suffering that Dennis experienced after the death of his son. That how he came to understand in his own mind that this was something that his ex-wife had wanted, that she had not jumped into the pool she had gone running for a neighbor, and that that's how he had developed this blame. And it is absolutely correct, Your Honor, that we do not have a long criminal history that we frequently do see in capital cases. But what we do have is a person who, at his home, had been planning in his mind and fantasizing about killing both Doreen Ebert and her husband, Charles, to the point where he had built boxes similar to coffins, had weights and body bags, and had planned to dump them in the water somewhere so that they would experience what Paul felt when he was drowning in the pool. So he had an idea and plans and had taken great steps beyond simply thinking about it to come up with the mechanism to kill both of them. And then on Halloween night, he dons two masks, takes a machete that he had purchased weeks before, another knife and a gun, and goes to the home of Denise Ebert, who at that time was eight months pregnant. When she answered the door, he immediately engaged in a vicious attack, which resulted in, among other things, her abdomen being slit open so that the fetus was expelled. Both she and the fetus had extraordinarily deep cutting injuries with parts of their bodies severed or nearly severed. And I think it's very strongly shown by what the prosecution focused on in their closing at the penalty were the facts of this crime. Well, that's what the California Supreme Court said. I mean, the California Supreme Court said that in just describing it, the penalty phase presentation by the prosecutor relied almost entirely on the evidence of the crime. So the prosecutor apparently believed that the nature of these crimes justified the death penalty and that there was nothing else they needed to show the jury, basically. That's correct, Your Honor. And I think that while we may see a case where someone has been given opportunity after opportunity to turn their life around, they start out maybe dealing some marijuana, they move up to armed robbery, they do whatever, before they finally get to the point where they're facing a capital case, some crimes are just so egregious that they don't need to have that history in order for a jury to find that the appropriate penalty is death, as they did in this case. The planning that went into this, the steps to evade detection, the making up stories about playing with a knife, that's how I cut my hand, that's how I got blood on this or that, telling, I believe you told the press, they're only looking at me because they always look at the husband, it's probably some serial killer, it's too hard to find a serial killer, so they're going to blame me. And then morphing over time, as Dr. Cohen's report and his testimony showed, into I had to avenge my son because she killed him, she wanted him dead, and so I had to avenge him, and that's why I did this. So it was this kind of progression over time, once he's been caught and they're focusing on him, he tried to deflect that investigation and it didn't work. And also, and I don't remember exactly where it is in the evidence, there was evidence, there was an article that Dennis had that was found in his home about the insanity defense. So if counsel also knew that, it's also not, had he tried to put on an insanity defense, it's quite possible that that would have come out to each of his experts. What about this article? He's studying up on it. He knows what he needs to say. I think you've also argued in your brief that there are at least some cases or perhaps studies that discuss that putting on a failed NGI can doom your ability to get life instead of death at the penalty phase. Yes. If you have a weak case and you don't succeed, that it makes the penalty phase outcome worse. That's correct, Your Honor. And I think also, and this moves a little bit into the, comes from the conflict of interest claim that was raised, is that when you look at the article from which Dennis draws most of his concerns about counsel's later feelings about doing defense work, but one of the things the article talks about is his colleagues, the district attorney at the time of that article, said that he was the best public defender we had for saving somebody from the gas chamber. A colleague said if you're trying capital cases, it was what he did best. And so I think we have to look at that, is that this is not a brand-new attorney who had never done this. This is not somebody who was a year out of law school that was thrown into this. This was somebody who knew what he was doing. And I think also if you read his closing argument and not just the, oh, I felt helpless and I didn't prepare a long statement, if you actually look at his whole closing argument, it's exactly what his colleague was talking about. He went to the jury and put his emotion out there to convince them of why they should spare his client. He talked about some homilies. He talked about an incident when he was skydiving, and that was one of the things that Dennis now complains about. He was talking about personal experience. But he turned that around and said, you know, when I'm skydiving, I jump out of that plane, and I'm hoping my parachute works. Doreen Erbert was Paul's parachute. She failed him, showing the torment, the feelings of helplessness. Although, you know, he's portrayed here, depending on which side you read on the habeas, as a good attorney. I was quite surprised that he didn't jump right out of his chair with respect to the prosecutor in closing, that not a single witness stood up here and, you know, argued for mercy or made that statement. There was no objection to that. So I'll ask you the same question that I asked his counsel, and that is, what was the state of the law at the time in California? The state of the law at the time, Your Honor, was that the jury could consider mercy. But I think it was not as clear as to whether or not a witness could actually ask for mercy because it was clear in terms of, like, victim impact. A victim could not say, I want him to be executed or I want him to be spared because that's the open issue. And what we've got here is it's, quite frankly, unfathomable that jurors could hear from witness after witness about how important Dennis had been to their lives. The help he had given them financially, the help he had given them just in other ways of letting people stay with him, getting behind on the rent if, you know, he would understand it, what a great father, the torment he felt, the love by his mother and his stepmother. They talked about their love for him. It's a backhand way of making that, but it wasn't certainly explicit. So are you suggesting that had the witnesses actually testified with respect to the importance of his life, that that would not have been allowed? No, the witnesses did testify. No, they talked about, you know, who he was to them and all of that, but they didn't really capsulize what is characterized as mercy testimony. I suspect that at the time, one, I'm not sure that the prosecution really would have objected had they asked, although there was certainly concern that they would. Had the witnesses used the word mercy, I suspect the court would have allowed it. Certainly, as I said, it's a consideration, but I think what you also have to look at is given what they said, it is essentially, like I said, unfathomable that a jury could hear that testimony about the specifics, and essentially because the witness said, oh, and I want you to give him mercy, would essentially write that off and ignore it and let it go. And again, reading the entirety of the closing argument, that's what that argument was all about for Mr. Gonzalez. You can give mercy. You can give sympathy. You should. The prosecutor has asked you to show courage and execute my client. I am asking you to show courage and give him sympathy and mercy and let him live. The prosecutor talked about Cain and Abel. He said the ultimate chance for deterrence, and yet God said, I am a merciful God and banished Cain. And he said, that's what I want you to do is banish my client to life in prison. So his entire argument was about mercy and sympathy and the fact that the jury could and should consider those at that stage. And to think that the jury would have somehow ignored all of that evidence just because the witnesses did not say mercy just doesn't seem reasonable. And I see I'm out of time. All right. Thank you, counsel. Counsel, how much time would you like for a rebuttal? Could I ask for 15 minutes? We're not going to give you 15 minutes for a rebuttal, but we'll give you five minutes for a rebuttal. We respect you for asking, though. Okay. Unfathomable jury wouldn't consider what they said, meaning that they wanted him to live. Then how did the DA get up and say, not one person? You can't have it both ways. Okay. Closing argument. It was personal anecdotes. It was the story of the Bible. It was the story of that. It was not driven home about Michael Dennis. He didn't even mention Dr. Benson's testimony in the guilt phase, which, disagreeing with the district court who said that it happened mere days before, happened 18 days before. That's not mere days. He didn't mention Benson. It wasn't driven by the mitigating facts, and that's important. But you can't make a decision about putting on or not putting on an insanity defense unless you've done the investigation to make a determination that it exists. This decision, because there was an article, or this decision that we don't know that was made, but whatever was made without the investigation needed, because when the investigation was done, all of the doctors said, I would have testified as to an insanity defense, as would Dr. Wood. The crime equals death is not the law. If that were the case, then we would have a list of crimes, law enforcement officer shootings, child killings, whatever. We would have those, and that would be then it's automatic death. It's not the law in California. It's not the law in the United States. Had no choice but to rely on the facts. The court asked with respect to aggravating evidence that that's what the district attorney did. No. The district attorney had three things it could do. It could introduce facts and circumstances of the crime. It could introduce other felony convictions, or it could introduce other acts of violence. It didn't introduce any other aggravation because it didn't have any, because Mr. Dennis is unique. No prior criminal record. Perfect prisoner. Perfect model inmate, et cetera. Those are the things that drive. Boxes, coffin, another wild, deluded kind of idea, because that's not how the crime occurred. The crime occurred in this bizarre October Halloween night. It didn't have anything to do with that. Watson found left temporal lobe problems. Damage. IQ doesn't mean anything when it comes to insanity or mental health or mitigation. It may mean you're not Atkins, intellectually disabled, but it has nothing to do with that. Dr. Watson supported Wood's testimony completely. The other doctors, the same thing. While the earlier reports that they had may have said things, Dr. French's MMPI would have come in. It supported Dr. Benson. It supported Dr. Woods. Dr. Caldwell's MMPI. We had the guy that produced the MMPI come in and testify about what the results were. All of those doctors would have come in. Experts weren't unwilling to make the diagnosis. The experts didn't have the information to be able to make the diagnosis, and the diagnosis was not grief. It was not depression, although I'm sure Mr. Dennis, as we can all imagine, was going through grief and was certainly depressed over the situation. The diagnosis that was there that wasn't picked up by trial counsel was delusional disorder, and that is what explains all of the actions in this case. And had all of this been presented, if nothing else, it could have had the effect and would have had the effect of one juror saying, I'm not going to vote death because he's not the kind of person that we know about, that deserves death. He is a unique individual. I think I've gone over my phone. No, you still have a minute. Okay. Prima facie case. Look, the California Supreme Court had an unreasonable application of Strickland, and it's a D-1 violation. Had they done what they should have in terms of ordering an OSC and or allowing us for an evidentiary hearing, then they wouldn't have done what they did do, which made an unreasonable determination of the facts under Broomfield v. Because they should have ordered the OSC. They should have allowed us to present all that evidence to them back at the time period when the second petition was filed in the California Supreme Court. And had they done that, they would have had all of this evidence inside their purview so that they could have made that determination. They did not. They shunted this away by simply saying denied. Grief was not the decision. You're now out of time. If you have a final point, Counsel, you can make it. Yes. If I can just have one second. Sure. Law. Mr. Dennis should prevail in this case, especially in terms of penalty. Mr. Dennis' case is one of those that law and justice require relief. Thank you. All right. Thank you. We thank both counsel for their helpful arguments and their hard work in this case. The case just argued is submitted. And with that, we are adjourned. All rise. This court for this session stands adjourned.
judges: McKEOWN, CLIFTON, BENNETT